May it please the Court, Bart Volkmar appearing on behalf of Petitioner Ong Jin. With the Court's permission, I'd like to request two minutes of rebuttal time. Yes, you'll have to help keep track of your own time, because that's the full time that's available. Thank you. Based on the undisputed facts in the record, Mr. Jin is eligible for asylum and withholding of removal under this Court's holding in Ma versus Ashcroft. In Ma, the Court held that a husband is automatically eligible for asylum and withholding when his wife is forced to have an abortion and the couple's marriage would have been recognized but for the course of family planning policies of the Chinese government. And that's precisely the factual situation that is presented here. By your spin or by the record? Pardon? Is that precisely the situation by your spin or by the record? I believe that the record supports... The record supports that they're not married, doesn't it? It absolutely supports the fact that they're not married in a manner that is recognized by the Chinese government. And the only thing they did was have a drink of wine together, in your opinion, that makes them married. Isn't that so? Respectfully, I don't believe that's what the record... What does the record show? The record shows the couple moved in together. Yes. And when... At the time they moved in together, Ms. Jingjing Sun was only 19 years old and so therefore they were unable to register their marriage. Under China's course of family planning policies, there was absolutely no way that they could have married at that time. They did cohabitate for a year and a half. They lived together as husband and wife and they held themselves out as husband and wife during that entire time. When Ms. Sun turned 20 and it was possible for them to marry, they went to the birth control committee in Ms. Sun's home village of Zhu Li and they asked for the birth control committee director to approve the marriage and to let them get married. And the birth control director refused and said, no, you can't get married, Ms. Sun needs to be 23. And again, that's also part of the course of family planning policies. The Chinese government wants to delay marriage as long as possible in order to reduce the number of children. So Ms. Sun wasn't permitted to marry and Mr. Jing believed that they should have been able to marry at that point. Instead of just... What was his solution? I'm sorry, Your Honor? So what was his solution? His solution was to, instead of just accepting the ruling of the birth control committee, he asked a local party official to come to a banquet. He asked Ms. Sun's father to throw a banquet for a local party official, hoping that he would change his mind. They asked, Secretary Wang was the party official. They asked him, please reconsider this decision. Please intervene on our behalf. Please allow us to marry. We want to save the life of our unborn child. And Secretary Wang was not receptive. When it was revealed that Ms. Sun was pregnant, Secretary Wang... Someone told him that she was pregnant, your client. My client, Mr. Jing, told Mr. Wang at the banquet, at that point, I don't believe that anyone knew. The birth control committee director didn't know. And finally, I think as a last-ditch effort, is the way I read the record, Mr. Jing revealed that Ms. Sun was pregnant, saying, please help us out here. And Secretary Wang became angry and he said, no, you have to get an abortion. It has to happen right away. And if you don't get an abortion, your family, Ms. Sun's family, is going to be, is going to suffer loss of property, heavy fines. What was your client's response to that? I think it was, he got put in a very difficult situation, I think, that the couple talked about. What did he do? On November 11, 1999, the couple ended up having an abortion. I believe that under the court's jurisprudence, I'm thinking of Ding v. Ashcroft, Wang v. Ashcroft, that that abortion was indeed forced, that economic coercion. I think the record is satisfactory that it was a forced abortion. I think at the time that was a question, but then it was, it's acknowledged that it was a forced abortion. It was forced because the husband revealed the wife was pregnant. She knew what would happen if they knew, because she was going to the countryside to have the baby and it was going to be just fine. But when he revealed it, and they had the abortion, his response was to come to the United States. So overwhelmed he was, he came to the United States. Did he bring her? I believe that when he came to the United States, that Ms. Sun and Mr. Jin, that was a decision that they came to together, that they... Did he bring her? Oh, no. I'm sorry, Your Honor. No. He did not bring her. Did you find a case anywhere where only the husband, so traumatized by the fact of the abortion that he had to leave his wife and come to the United States alone and then ask for relief? Have you found a case where the husband was relieved? I do have a case. Unfortunately, it's not in the record. I'd be happy to submit a supplemental. Let's talk about the record. In the record, every one of those cases where the husband was included, the wife was here with him. This one, the wife isn't. He's abandoned her in China, and he's now asking us for relief. Isn't he? I believe the relevant test is whether he suffered persecution on November 11. He suffers persecution if she has the forced abortion, only, as I understand it, if they are married, if they're husband and wife. Right. Now, in Ma, we said, all right, they did everything they possibly could to be married. They lived together. They made plans to come to the United States. And therefore, because they couldn't get the marriage that was valid for all religious and other purposes recognized, that they were married for purposes of our immigration laws, I understand it. That's right. Now, the problem here, I think, that Judge Ferris is having, and I must say I am, too, is that I am not seeing how, beyond the fact that there was a dowry and they wanted to get married in 1999, after that point, that there was any really, after he decided to go to the United States, that there was anything that indicated that there was the same kind of relationship that there was in Ma. Well, a few things in response. In Ma, there's basically one sentence in the opinion that says that they had a traditional marriage. That's the sum total of the record on that union. And I went and I read the briefs in Ma, and again, it was very sparse on exactly what they did. I think here, the evidence is just as strong. When he paid Ms. Soon's father that dowry, and then they went to the birth control committee to get approval, and they said, no, you can't get married, I think at that point, Mr. Ginn had taken all the necessary steps to become pregnant. I think in this situation, we're dealing with either a de facto or a no. You don't mean to become pregnant. You mean to be married? Yeah. I'm sorry if I misspoke. I think that in this situation, we're dealing with a common law marriage or a de facto. Well, we know that, you see. Does this record show that he has supported her from the time he left her in China until now? I think the record... Does the record show it? I don't... I think the record is silent on his... It certainly is silent on it. It says nothing about it. It says that he left her. And then there's a series of letters. I don't know whether they've been translated, but the only translation we have been told about was her letter where she said to him, why don't you return to China and marry me? Now, is that a letter from a wife? The letter from the wife on the July 2000 letter also referred to... Didn't she say that? Why don't you return to China and marry me? Right. They were not married in a formal sense that was recognized by the Chinese. They were saying they were married and that both of them thought they were married. Is that what a wife who thinks she's married would write to a man who's left her in China? In July 2000, when Ms. Sun wrote that letter, she also referred to Mr. Jin as her husband and Mr. Jin's father as her father-in-law. So I think that the July 2000 record, 2000 letter supports the contention that they were in fact married at that time. Well, let me ask you one question before you sit down, because you want to reserve your time. Your quarrel, as I understand it, with the BIA is that it said that absent a formal ceremony, they're not married. And you say they can be married even though they didn't have a formal ceremony if there were all the other accoutrements of holding out and being married. Is that right? If there's sufficient indicia of a marriage, there's many ways in which a couple might join in a matrimonial union. Now, did the BIA consider that? I think the BIA looked for a bright line test. Either you had a formal ceremony or you did not. In Mr. Jin's case, he's not a religious person. The society he came from. Where in this record does it say that they have a formal marriage? What he said they had was that they had a drink of wine together. They did the traditional wine drink. And that's what they did. I think that the record is a lot greater than that as far as what they did to demonstrate their marriage. But I'd like to reserve. OK. We'll give you a minute. Thank you. Ms. Horstman. Thank you very much. Elizabeth Horstman from the United States Attorney's Office in Montana for the respondent. And I appreciate the patience everybody has had with us while we have technological difficulty. I think that the justices have nailed. I think you ought to put that mic to the side of your face rather than directly in front because we don't hear you clearly. Can you hear me better now? Yes. Great. Thank you. I think that the justices have in fact hit the issue squarely. By pointing out that there are insufficient indices of marriage in this case. Under the Ma case, there was a formal ceremony according to Chinese customs. There was then the registration of the marriage by Ma after he's in immigration detention in Guam. He goes back after he turned 22 and in fact registers the marriage. The Ma case I think is the best case supporting the respondent's position by virtue of the contrast of the adversity overcome in that case in that matter to contrasting that to the facts at bar. And I think what we have here is we have a petitioner. We have a 42 year old who's a businessman. He's a successful businessman. He's running businesses in several cities in China including Beijing. And he chooses a 17 year old from his workforce, one of his employees. They become involved in a relationship. She comes to live with him. And at this point, he's traveled to the United States. He understands a lot about Chinese custom. He's been previously married. In fact, he's already a father. He's already had the reproductive opportunity to sire a child. Now, what we have is a pregnancy when Ms. Sun was 19. They go to her home province rather than any of the other locations. And at the local province, they say, well, she has to be 23 here. And there was the opportunity, we believe, that she could have, they could have gone to another location and become married at that place. However, they were going to the home village or the home area. Then we find that at that time, she's 20. She's capable of being married in an area other than her home area. And then at age 21, in July of 2000, she does write a letter which I think is very important in this case. And she says, you know, when are you coming back to marry me? And at that point, she's 21. She's not 23.  And I would also point out that after he leaves, again, he obtains his visa to come to the United States prior to the abortion in this case. So he has intentions of coming to the United States prior to the abortion. But Ms. Horstman, let me tell you what troubles me about your argument. All of this may be in the record, but it's not really the basis on which the board distinguished Ma. The board seemed to distinguish Ma on the ground that there was a ceremony, or at least that's the argument of your adversary. And there's some merit to it that the principal factor looked to by the BIA in this case was the lack of a formal ceremony. And that, and you are relying on a lot of other facts that were not relied upon the BIA. What is your, and we have to decide the case on the basis of the ground that the BIA decided it. What is your response to that? Thank you, Your Honor. The BIA has to find some indice of marriage. And in Ma, it relied on the customary formal relationship or formal marriage ceremony as being an example or an indice of the fact that there was a marriage. In this particular case, we have these series of events that quite frankly indicate more of a fiance or more of a engagement than in fact a marriage. Yes, but Ms. Horstman, the BIA didn't go through that litany, did it? It said that there is no significant event such as a ceremony upon one which could determine that the respondent entered a marriage that the Chinese government refused to recognize. And as I understand it, your argument is not that it's only the absence of a ceremony that makes this a non-marriage. It's all of the circumstances. Correct. In other words, that they used, the board used the fact that there had been a traditional ceremony as an indice or proof, evidence, substantial evidence that there in fact had been a union. In this particular case, all of the facts that the petitioner has pointed out as being evidence of marriage are in fact not evidence of marriage in Chinese culture. It's just a matter of certain. Well, but the BIA didn't find that. You just made an assertion that hasn't been found. So I don't think we can find it under Ventura and say, well, we're going to decide this on a different ground than the BIA did, make it a different decision. That's my problem. It seems to me that if you want a decision based upon all the circumstances and a finding that they weren't, they were more like fiancés than husband and wife, that we'd have to send it back for the BIA to consider that. Well, I think that the BIA did look at, for some event, and they settled on the fact that there was a traditional ceremony. And... Well, do you want us to make that a bright line rule? I don't think you're arguing that here, that if they don't have a formal ceremony, they can never be married. And that seems to be what the BIA was doing. Do you disagree with that? Or can you show me language where they looked at all the circumstances in the manner that you were suggesting we should? Well, I think that they had in the record before them all the circumstances that we've discussed, both in the briefs and then during oral arguments. So I think that we can infer that those were, in fact, in front of them. But when we look at the congressional intent of this policy or of this program, we see that one has to ask, how is granting asylum to Ang Jin going to further the congressional policy? And that is to reunite families and to provide a relief against the oppression  and that is not going to be furthered in this case. This is not an appropriate case for extension of that congressional policy. For example, in Lee v. Ashcroft in the 9th Circuit 2004, the boyfriend status of the woman was not sufficient to make him eligible for the asylum. And in Zhang v. Gonzalez, the daughter relationship was not sufficient. Again, both of those cases, there was this discussion about the congressional intent of the program. And there is a 5th Circuit case from 2004 in Chen v. Ashcroft. And in that case, the 5th Circuit, distinguishing law in that case, found that the fiancé relationship was not enough. And so at some point... What Judge Schroeder is asking you to do is what you ought to do right now if you have it before you. Do you have the BIA's decision before you? I have a portion of it. Judge Schroeder is referring to it and I think you will find that it says some significant event, such as a ceremony. It doesn't say a ceremony. It says some significant event. And I gather your argument is, and the reason you're talking about all these other things, you are arguing that there is no significant event. They didn't say that there'd be a ceremony. My reading of it may not, my recollection of the reading may not be accurate and that's why I ask you if you have it before you. But I think the language is that there'd be some significant event such as a ceremony. Now isn't that what it says? That's correct, Your Honor. All right. And that's... And that's what you're arguing. The argument here is that there is no significant event. There was an equivalent to that. But let me ask you this. What the BIA says is not only did the couple in Maugh memorialize their intentions to marry by way of a traditional ceremony, but once the couple reached the legal age of marriage, they were able to receive a certificate from the government which recognized their marriage as a de facto marriage because they had a wedding ceremony according to custom. Now is your argument that that did not happen here? Yes, that there is insufficient indice of marriage either by custom or by the official registration of the marriage. And I would point out again in Maugh that Maugh, when he turned 22 and was of age and while apparently he was in INS detention in Guam, he obtained that registration certificate  In this case, after Aung San Suu Kyi leaves his son in China, he comes to the United States and in the record there's no show of number one, that he attempted to register the marriage even after she was saying in 2000, look, I'm 21, I'd like to get married.  And then second, there's been, the record is absence any showing of support back to her while she's in China. In fact, it shows that she goes back to work after he leaves and she has progressed through the ranks and has been successful in China. So in this particular case, we don't see either at the time sufficient, at the time that the abortion occurs, that there is sufficient indice or some significant event or some ceremony that establishes sufficiently to the BIA that there is a marriage. And then after the fact, this has not occurred either. Thank you. Your time has expired. Thank you very much. I'd like to hear the petitioner respond to that argument. Thank you, Your Honor. I think that if the court is inclined to rule that the BIA applied an incorrect legal test under Ma to determine the status of the couple in this case, that the case should be remanded. Don't bet on that at the moment, because what we've got to do is decide it on the record that is before us now, don't we? Absolutely. We have to decide it on the record. But I do believe that if the BIA employed an improper legal test that it should be remanded for purposes of this record shows that it did. To the extent the BIA required there to be a significant event, such as a ceremony. But counsel, what the government counsel just pointed out was the passage that I read, which says that not only in Ma did they memorialize their intentions by way of a traditional ceremony, but they also said that if the BIA was to marry, they went and got it registered. Now, the government says that didn't happen here. That didn't happen here. And I don't believe that it's required under the Ma case. There's no evidence to suggest that such certificates are generally available or that Mr. Jin could have obtained one here. How could he have obtained it? He had left China. When did he leave China? How many years ago? He left China in 1999. And he hasn't been back. He hasn't seen his darling wife since 99. That's correct. But... Now has he brought her here or attempted to bring her here? Has he? Does the record show that he has? I'm sorry, could you repeat the question? Does the record show that he's attempted to bring her here to reunite with her? She's asking him to do it. The record... What does the record show? The record, as of the time of the hearings in front of the IJ, there was nothing like that in the record. But I think on the second point, there's no requirement to show certification or approval from the Chinese government. I think Ma holds the exact opposite. It's such... Well, that's a question we're going to have to discuss. Okay. Thank you very much. The case just argued is submitted for decision. We'll hear the next case, which is Willoughby v. Barnhart. Thank you.
judges: Schroeder, Farris, Rawlinson